# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

    *Plaintiff*,

v.                                                                                                  **Civ. No. 03-538 JP/RHS**

$23,100.00 IN U.S. CURRENCY,

    *Defendant*,

GLEN ALBIN FOR JOHN ALBIN ESTATE,

    *Claimant*.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

On March 16, 2005, the Court held a bench trial in this case. Stephen Kotz, Assistant United States Attorney, represented Plaintiff United States of America at the bench trial while attorneys Joseph Kennedy and Glenn Smith Valdez represented Claimant Glen Albin. Claimant Glen Albin was not present at the bench trial. The Court has considered the briefs and exhibits filed with respect to the United States' Motion for Summary Judgment (Doc. No. 39), heard the testimony of witnesses, reviewed the exhibits accepted into evidence at trial, heard the oral arguments of counsel, and has reviewed the trial pleadings and relevant law. The Court now makes the following Findings of Fact and Conclusions of Law:

### FINDINGS OF FACT

1. On October 20, 2002, New Mexico State Police Patrolman Clifford Samuel Hooper stopped a maroon Dodge which was speeding westbound on United States Highway 54 between Logan, New Mexico and Tucumcari, New Mexico.

2. As Officer Hooper approached the vehicle and the driver rolled down his window, Officer Hooper smelled an odor that he recognized as burnt marijuana coming from inside the vehicle.

3. The driver of the vehicle was identified as James Brian Underdal and the passenger was identified as John Michael Albin.

4. Officer Hooper asked Underdal for his driver's license and the vehicle rental agreement.

5. Both Underdal and Albin had Missouri driver's licenses.

6. Albin indicated that he had rented the vehicle. The rental agreement stated that Albin rented the vehicle in Kansas City, Missouri on October 18, 2002 and was to return the vehicle on October 25, 2002.

7. Officer Hooper asked Underdal to exit the vehicle so Officer Hooper could issue a speeding citation.

8. Underdal told Officer Hooper that he wanted to plead guilty to the speeding citation and pay the fine by mail.

9. Officer Hooper smelled the odor of burnt marijuana coming from Underdal's person.

10. While Officer Hooper was issuing the speeding citation, he asked Underdal about his travel plans. Underdal stated that he was going to Phoenix, Arizona to visit his son and would return to Missouri in a couple of days. Underdal also stated that Albin was going to Phoenix to visit a grandchild.

11. Officer Hooper then went back to the vehicle to verify the VIN number on the windshield and the NADAR sticker located on the driver's side door. While Officer Hooper was

checking for the VIN number and NADAR sticker, Officer Hooper asked Albin about his travel plans. Albin stated he was going to Phoenix to visit a female named Mae whose last name he did not know. Mae had just been married.

12. Once again, Officer Hooper smelled the odor of burnt marijuana coming from inside the vehicle.

13. After Officer Hooper verified the VIN number and NADAR sticker, he gave Underdal a copy of the speeding citation and an envelope with which to mail the fine.

14. Officer Hooper continued to detain Underdal and Albin to investigate further criminal activity. Factors which Officer Hooper considered in making his decision to further detain Underdal and Albin included the strong smell of burnt marijuana coming from the car, the fact that Underdal and Albin were traveling in a rental car westbound on Highway 54, and the fact that Underdal and Albin gave conflicting stories about why Albin was traveling to Phoenix.

15. Officer Hooper first asked Underdal if he was carrying over $10,000 in cash. Underdal stated confidently, "No."

16. When Officer Hooper asked Underdal whether he had any weapons or narcotics in the vehicle, Underdal hesitantly answered, "No."

17. Officer Hooper then asked Underdal for his permission to search the car. Underdal stated that he could not give Officer Hooper permission to search the car but did give Officer Hooper verbal and written consent to search his personal belongings which consisted of a shaving kit that contained only a toothbrush and toothpaste.

18. Officer Hooper then asked Albin if he could ask him some questions. Albin agreed.

19. Officer Hooper asked Albin if he had any large amounts of cash over $10,000. Albin became very hesitant after being asked this question, dropped his head, averted his eyes away from Officer Hooper, started to answer, then hesitated, and said, "No."

20. When asked if he had any weapons, Albin again put his head down and said, "No."

21. Albin also put his head down and hesitated before answering "no" to Officer Hooper's question of whether Albin had any narcotics or marijuana. Albin, however, was very confident in denying that he had any cocaine, heroin or methamphetamine.

22. Officer Hooper then asked Albin if he would allow a search of the vehicle. Albin gave Officer Hooper verbal and written consent to search the vehicle.

23. Officer Hooper first searched the passenger compartment where he found surgical clips burnt on the end under the passenger side seat. Those clips smelled like burnt marijuana.

24. Officer Hooper then asked Underdal and Albin where the rest of the marijuana was. Albin removed a plastic bag of marijuana from his shoe.

25. Because Albin and Underdal had lied to Officer Hooper about the presence of narcotics, Officer Hooper decided to extend his search to the trunk of the vehicle.

26. The search of the trunk revealed a nine inch hunting knife and a backpack which contained hallucinogenic mushrooms, marijuana paraphernalia, and $23,100 in cash divided into five bundles wrapped with rubber bands.

27. The cash consisted of 94 one-hundred dollar bills, 59 fifty dollar bills, 506 twenty dollar bills, 51 ten dollar bills, and 24 five dollar bills.

28. The bundling of the cash was inconsistent with the way money is received from a financial institution, and the large amount of twenty dollar bills may indicate street level narcotics

4

sales.

29.  The trunk also contained two large empty duffel bags and a closed basket containing some clothing.

30.  The two duffel bags could carry a total of 200 to 300 pounds of marijuana.

31.  Duffel bags are commonly used to transport narcotics.

32. After he searched the trunk, Officer Hooper called for back up officers and arrested Underdal and Albin.  A more thorough search of the vehicle did not reveal any other contraband.

33.  After Albin's arrest, the contents of his wallet were copied including copies of two valid credit cards and a receipt for a pager with the notation that the messages number was forgotten.

34.  Albin had a prior arrest for the attempted purchase of Dilaudid and Underdal had an extensive criminal history involving narcotics.

35.  Albin had been unemployed for years and was on Medicaid at the time of his October 20, 2002 arrest.

36.  Albin subsequently died on January 2, 2004.

37. Drug couriers usually rent vehicles to avoid forfeiture of their personal vehicles.

38.  Highway 54 is a known smuggling route and back highway.

39.  Phoenix is a drug source city.

40.  Drug money usually travels from east to west while the drugs themselves travel from west to east.

41.  Drug couriers can carry personal amounts of drugs known as "trip dope."

5

42. Evelyn Kilgas, a special agent with the Drug Enforcement Administration, approved the adoption of the forfeiture of the $23,100 on November 27, 2002.

## CONCLUSIONS OF LAW

1. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1345 and 1355.

2. The United States brought this forfeiture action under 21 U.S.C. § 881(a)(6), which provides that the following is subject to forfeiture to the United States:

> All moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance or listed chemical in violation of this subchapter, all proceeds traceable to such an exchange, and all moneys, negotiable instruments, and securities used or intended to be used to facilitate any violation of this subchapter [the Controlled Substances Act].

3. This case is also governed by 18 U.S.C. § 983, part of the Civil Asset Forfeiture Reform Act of 2000.

4. The United States is "barred from introducing evidence illegally seized in violation of the fourth amendment to prove a claim of forfeiture." *United States v. $149,442.43 in U.S. Currency*, 965 F.2d 868, 872 (10th Cir. 1992)(citations omitted). The Claimant argues that Officer Hooper did not have probable cause or reasonable suspicion to detain Albin and Underdal after Officer Hooper issued the speeding citation.

5. "During a routine traffic stop, an officer may request a driver's license and vehicle registration, ask about travel plans and vehicle ownership, and may run a computer check before issuing a citation. ... Once the driver has produced a valid license and proof that he is entitled to operate the car, further detention and questioning beyond that related to the initial stop is permissible 'only if there exists an objectively reasonable and articulable suspicion that criminal activity has occurred or is occurring.'" *United States v. Arnulfo-Sanchez*, 71 Fed. Appx. 35, 38

(10th Cir. 2003)(citations omitted).

6. In this case, Officer Hooper had an objectively reasonable and articulable suspicion that Albin and Underdal were involved in a criminal activity based upon the smell of burnt marijuana coming from the vehicle and Underdal's person, the conflicting stories regarding Albin's travel plans, and the fact Underdal and Albin were traveling westbound on Highway 54 in a rental car. Consequently, Officer Hooper properly detained Albin and Underdal after having issued the speeding citation so Officer Hooper could further question Albin and Underdal.

7. Moreover, "[i]f an officer smells marijuana in the passenger compartment of a vehicle, he has probable cause to search the passenger compartment. ... The odor of marijuana in the passenger compartment of a vehicle does not, however, standing alone, establish probable cause to search the trunk of a vehicle. ... Rather, an officer obtains probable cause to search the trunk of a vehicle once he smells marijuana in the passenger compartment and finds corroborating evidence of contraband." *United States v. Parker*, 72 F.3d 1444, 1450 (10th Cir. 1995)(citations omitted).

8. Officer Hooper had probable cause to search the passenger compartment based upon the odor of burnt marijuana coming from the vehicle.

9. Officer Hooper also had probable cause to search the trunk after he found marijuana paraphernalia in the passenger compartment and Albin produced marijuana from his shoe.

10. Officer Hooper's search of the vehicle's trunk, therefore, did not violate the Fourth Amendment.

11. The United States' burden of proof in this case is to establish by a preponderance of the evidence that the $23,200 is subject to forfeiture. 18 U.S.C. § 983(c)(1).

12. The United States has established by a preponderance of the evidence that the $23,100 constituted illegal drug proceeds which Albin intended to use to facilitate further drug trafficking.[1] The totality of the facts giving rise to this conclusion include the following:

a. Underdal and Albin gave conflicting stories regarding Albin's travel plans;

b. the manner of the bundling of the $23,100 was inconsistent with the way money is received from a financial institution;

c. the large amount of twenty dollar bills is consistent with street level narcotics sales;

d. the empty duffel bags, which are commonly used to transport narcotics, could contain a total of 200 to 300 pounds of marijuana;

e. Phoenix is a drug source city, *United States v. $22,474 in U.S. Currency*, 246 F.3d 1212, 1216 (9th Cir. 2001)(Phoenix is a known drug source city);

f. traveling westward with a large amount of cash, like Albin and Underdal did, is consistent with the direction of the flow of drug money for trafficking purposes;

g. Albin rented a vehicle instead of using a personal vehicle;

h. the presence of two valid credit cards indicates that Albin probably did not have a legitimate reason to carry $23,100 for a trip lasting just a few days;

i. Albin's apparent ownership of a pager is consistent with drug trafficking although at some point Albin may have forgotten the messages number;

j. the personal amounts of drugs found in the vehicle could be "trip dope" for use in traveling to make a drug transaction;

---

[1] Although Claimant Glen Albin initially claimed an innocent owner defense, that defense was abandoned just prior to the bench trial. *See* 18 U.S.C. §983(d).

8

k. Highway 54 is a known smuggling route and a back highway;

l. it is unusual to plan a trip to visit a person whose last name is unknown;

m. $23,100 is a large sum of money consistent with a reasonable amount of money for use in drug trafficking, *see United States v. $149,442.43 in U.S. Currency*, 965 F.2d 868, 877 (10th Cir. 1992)("While we recognize that a large amount of hidden currency in itself is not enough to establish that the money was furnished or was intended to be furnished in return for drugs, this evidence is strong evidence of such an illicit connection to drug trafficking. ... Moreover, where this evidence is accompanied by other persuasive evidence [of drug trafficking], we conclude that probable cause has been established that the defendant property is either proceeds of or was used to facilitate drug trafficking.");

n. the absence of luggage, the small amount of clothing present in the trunk, and the minimal toiletries found in the vehicle are inconsistent with vacation travel;

o. Albin had been unemployed for years and was on Medicaid, *see United States v. $11,557.22 in U.S. Currency*, 1999 WL 820230 **3 (10th Cir.)(where Defendant's "verifiable income cannot possibly account for the level of wealth experienced or displayed, and where there is strong evidence of drug trafficking, probable cause exists to believe that his unexplained wealth is a direct product of the illicit activity or is traceable to the activity as proceeds.");

p. Albin had previously been arrested on a drug charge;

q. Underdal had a criminal history involving narcotics;

r. Albin associated with Underdal, a known narcotics trafficker, *see United States v. $36,634 in U.S. Currency*, 103 F.3d 1048, 1054 (1st Cir. 1997)(associating with an

9

accused drug trafficker is a factor in establishing a nexus to drug activity); and

s.  Albin acted in a nervous suspicious way when asked about the presence of large amounts of money and marijuana in the vehicle.

13.  Forfeiture of the $23,100 does not violate the Eighth Amendment's prohibition against excessive fines because the United States has shown by a preponderance of the evidence that the $23,100 is forfeitable under §881(a)(6) as drug proceeds intended to be used to facilitate further drug trafficking.  *See United States v. One Parcel of Real Property Described as Lot 41, Berryhill Farm Estates*, 128 F.3d 1386, 1395 (10th Cir. 1997)(citations omitted)(the forfeiture of drug proceeds under 21 U.S.C. §881(a)(6) is not constitutionally excessive under the Eighth Amendment).

14.  The death of Albin does not abate a civil forfeiture under §881(a)(6).  *See United States v. $120,751.00*, 102 F.3d 342, 344 (8th Cir. 1996).

15.  Based upon the above findings and conclusions of law, the $23,100 is subject to forfeiture to the United States.

IT IS ORDERED that judgment will be entered in favor of the United States and the $23,100 will be forfeited to the United States.

_____
SENIOR UNITED STATES DISTRICT JUDGE